```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA


   JOHN AND EDITH VILLARRUBIA              CIVIL ACTION

   VERSUS                                  NO: 10-734

   ENCOMPASS INDEMNITY COMPANY             SECTION: J(3)
```
                          **ORDER AND REASONS**

The issue in this case is whether Plaintiffs validly selected uninsured/underinsured motorist coverage in an amount that is less than their automobile liability insurance limits. For the reasons that follow, the Court finds that Plaintiffs' selection of a lower UM coverage limit was valid and should be enforced.

Before the Court are the following cross-motions for summary judgment: (1) Defendant's **Motion for Summary Judgment (Rec. Doc. 41)** and supporting memoranda **(Rec. Docs. 54, 58 and 62)** and Plaintiffs' **Memorandum in Opposition (Rec. Doc. 48)** and (2) Plaintiffs' **Partial Motions for Summary Judgment (Rec. Docs. 82 and 83)** and Defendant's **Memoranda in Opposition (Rec. Docs. 89 and 92).**

1

**PROCEDURAL HISTORY AND BACKGROUND FACTS**

This case concerns a claim for bodily injuries to Edith Villarrubia and a claim for loss of consortium filed by her husband, John G. Villarrubia, arising out of an automobile accident that occurred on February 19, 2008, in the Parish of Jefferson, State of Louisiana.  The following facts are not in serious dispute.

On February 19, 2008, Mrs. Villarrubia was involved in an automobile accident with another driver, Raquel Vicente, who was found to be at fault.  Prior to the accident, Mrs. Villarrubia suffered from chronic, degenerative conditions of varying severity that affected her back and spine.  The February 19, 2008, accident allegedly aggravated Mrs. Villarrubia's pre-existing conditions, resulting in increased pain, reduced mobility, disruption of sleep, and decreased ability to participate in routine daily activities.

The tortfeasor, Ms. Vicente, carried the minimum $10,000 in liability insurance under a policy issued by AIG National Insurance Company, Inc.  AIG paid Mrs. Villarrubia the policy limit of $10,000, and Mrs. Villarrubia thereby settled her claims with Ms. Vicente.  Mrs. Villarrubia then sought to recover additional damages from her own insurance provider, Encompass

Indemnity Company. The Villarrubias had homeowner's coverage, primary automobile coverage, uninsured/underinsured motorist bodily injury ("UM") coverage, and umbrella coverage on their Encompass policy.

Mr. Villarrubia, an attorney who has represented Mrs. Villarrubia for prior personal injury claims, initiated settlement negotiations with Encompass on or around August 25, 2008, and claimed special and general damages totaling $102,000. At all times, Encompass insisted that the Villarrubias' UM coverage was capped at $50,000/$100,000 per the UM selection form they signed in October 2003. Encompass also gave written reasons for valuing the claim below the policy limit amount. Encompass issued Mrs. Villarrubia an unconditional tender payment of $4,250 on September 24, 2008. On November 11, 2008, Encompass offered another $250 to settle the claim, but the Villarrubias refused to accept that as a final settlement.

Meanwhile, Mrs. Villarrubia continued to experience symptoms and receive regular treatment from doctors, and Mr. Villarrubia provided Encompass with regular updates on his wife's condition, treatment she had received, and prognosis statements. When Encompass refused to increase their settlement offer, the Villarrubias filed this lawsuit in Louisiana state court on

January 19, 2010, and the case was removed to this Court on March 2, 2010.  Encompass then tendered another $45,750 in UM coverage payments to Mrs. Villarrubia, bringing the total paid to $50,000.

   Now that Encompass has paid the Villarrubias $50,000, which it claims is the maximum amount available under the policy, the main issue is whether the Villarrubias validly selected UM coverage in that amount.  Prior to the February 19, 2008, accident, Encompass issued policy number 262983386 ("the AWS policy") to the Villarrubias, with a renewed policy period of November 18, 2007, to November 18, 2008.  Before purchasing the AWS policy, Mr. Villarrubia made it clear that he needed at least as much coverage as his existing policy provided.  Because liability limits are at issue in this case, it is necessary to examine what the liability limits were under his existing Encompass policy.

   Prior to November 2003, the Villarrubias had in effect a policy of homeowner's and automobile liability coverage that was combined into one policy and issued through Encompass Insurance Company of America.  This policy provided, among other coverages, automobile liability coverage to the Villarrubias in the amount of $250,000/500,000 in underlying limits with  $1 million umbrella, or excess liability, coverage.  This policy (bearing

4

policy number 800258513) provided for $50,000/100,000 in UM limits, as selected by Mr. Villarrubia.

In October 2003, Mr. Villarrubia contacted a new insurance agent, Al Aparicio, at the agency of Aparicio, Walker, and Seeling, Inc., to get quotes for a new insurance policy with Encompass. Mr. Aparicio worked with his staff, and particularly with an employee named Joanne Buttone, to provide new quotes and a new policy for Mr. Villarrubia. Mr. Villarrubia provided the Aparicio Agency with copies of the declarations pages from his prior policy with Encompass Insurance of America, which reflected the policy limits noted above. The Villarrubias also completed a new UM selection form, which they both signed and dated on October 24, 2003, indicating their desire to select UM limits of $50,000 per person and $100,000 per accident. At the time this form was prepared, no new policy had actually been issued by Encompass, and no policy number was included on the UM selection form because a policy number had not yet been assigned.

Subsequently, a new policy was issued through Encompass bearing policy number 216983386. However, the declarations page for this policy, effective November 18, 2003, erroneously stated an umbrella, or excess liability, limit of $500,000 rather than $1 million as requested by Mr. Villarrubia in his application.

Mr. Villarrubia notified his new agent about the error on November 20, 2003.  On December 10, 2003, Ms. Buttone forwarded correspondence to Mr. Villarrubia confirming the clerical error and correctly stating that his umbrella coverage was in fact $1 million.  A new policy number, 262983386, was issued at that time.  However, the Villarrubias were not asked to, and did not, complete a new UM selection form.  Thus, their UM coverage remained at the previously selected $50,000/$100,000 limit.  This was the existing Encompass policy that was renewed in November 2007 (the AWS policy) and was in effect at the time of Mrs. Villarrubia's February 19, 2008, accident.

**THE PARTIES' ARGUMENTS**

**A.   Liability Limits Under the Policy**

The Villarrubias ask this Court to declare that the UM selection form they signed on October 24, 2003, is invalid as a matter of law, and that they are therefore entitled to UM coverage for the full liability and excess liability limits under the policy.  They set forth several arguments: (1) when the Aparico Agency adjusted the umbrella policy from $500,000 to $1 million, that increase in the liability limits required the completion of a new UM selection form; (2) Mr. Villarrubia always intended to have, and thought he did have, $1 million umbrella

liability and UM coverage over his properties and vehicles; and (3) the absence of a policy number on the UM selection form rendered it invalid under Louisiana Revised Statute §22:1295. The Villarrubias claim damages of $102,000, which exceeds the $50,000 they have received from Encompass, and argue that they are entitled to recover the $52,000 balance of their damages under their UM coverage.

Encompass, on the other hand, asks the Court to declare that the policy provides UM coverage of only $50,000 for Mrs. Villarrubia's claim. Encompass makes the following arguments: (1) § 22:1295 did not require that a new UM selection form be completed when the Aparico Agency corrected the Villarrubias' umbrella policy limit from $500,000 to $1 million; (2) such a finding would be consistent with the clear intention of the Villarrubias; and (3) Louisiana law does not require that the UM selection form contain a policy number if one did not exist when the form was signed.

**B.   The Villarrubias' Allegations of Bad Faith**

The Villarrubias also claim that Encompass acted arbitrarily, capriciously, and in bad faith in the interpretation and handling of their claims in violation of Louisiana law and is, therefore, liable for damages and penalties under the

applicable statutes.  The Villarrubias allege that they provided Encompass with adequate medical records, physicians statements, and evidence of pain and suffering, and Encompass' initial tender of $4,250 (later increased to $4,500), which it refused to further increase prior to the filing of this lawsuit, was not a reasonable amount under the circumstances.  They argue that the unreasonable tender violated Louisiana law because it failed to adequately consider general damages related to pain and suffering and loss of consortium, as well as special damages related to treatment.  The Villarrubias contend that Encompass' increase of the tender to $50,000 soon after the Villarrubias filed this lawsuit is evidence that Encompass knew its original tenders were unreasonably low.  Furthermore, the Villarrubias allege that Encompass' employees mismanaged the handling of their claim and actively sought to "rule out" the Villarrubias' UM claim by requesting helpful information from Ms. Vicente's insurance company.

Encompass responds that legitimate questions of fact exist as to the extent and nature of the injuries that Mrs. Villarrubia sustained as a result of the accident.  Encompass claims, and the Villarrubias seem to admit, that Mr. Villarrubia failed to disclose to Encompass' adjusters that Mrs. Villarrubia had

multiple prior claims for injuries to the same area of her body and that Mr. Villarrubia had actually represented her on those prior claims. Encompass identifies prior accidents that occurred on July 6, 1995, and September 5, 2000, which resulted in Mrs. Villarrubia's prior injuries. In light of these factual questions, Encompass asserts that it had a reasonable basis for initially refusing to tender a higher amount, and it is therefore not liable for bad faith damages under Louisiana law.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986).

**A.   Liability Limits Under the Policy**

Issuance of uninsured motorist coverage in Louisiana is governed by § 22:1295, which provides in relevant part:

> (1)(a)(i) *No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle . . . unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy*, under provisions filed with and approved by the commissioner of insurance, *for the protection of persons* insured thereunder who are legally *entitled to recover nonpunitive damages from owners or operators of uninsured or underinsured motor vehicles* because of bodily injury, sickness, or disease, including death resulting therefrom; *however, the coverage required under this Section is not applicable when any insured named in the policy either rejects coverage, selects lower limits*, or selects economic-only coverage, in the manner provided in Item (1)(a)(ii) of this Section. In no event shall the policy limits of an uninsured motorist policy be less than the minimum liability limits required under R.S. 32:900, unless economic-only coverage is selected as authorized in this Section. *Such coverage need not be provided in or supplemental to a renewal, reinstatement, or substitute policy when the named insured has rejected the coverage or selected lower limits in connection with a policy previously issued to him by the same insurer or any of its affiliates.*
>
> * * *
>
> (ii) Such rejection, selection of lower limits, or selection of economic-only coverage shall be made only on a form prescribed by the commissioner of insurance. The prescribed form shall be provided by the insurer and signed by the named insured or his legal representative. The form signed by the named insured or his legal representative which initially rejects such coverage, selects lower limits, or selects economic-only coverage shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespective of whether physically attached thereto. *A properly completed and signed form creates a rebuttable presumption that the insured*

> *knowingly rejected coverage, selected a lower limit*, or selected economic-only coverage. *The form signed by the insured or his legal representative which initially rejects coverage, selects lower limits*, or selects economic-only coverage *shall remain valid for the life of the policy and shall not require the completion of a new selection form when a renewal, reinstatement, substitute, or amended policy is issued to the same named insured by the same insurer or any of its affiliates. . . . Any changes to an existing policy, regardless of whether these changes create new coverage, except changes in the limits of liability, do not create a new policy and do not require the completion of new uninsured motorist selection forms.* For the purpose of this Section, a new policy shall mean an original contract of insurance which an insured enters into through the completion of an application on the form required by the insurer.

LA. REV. STAT. ANN. § 22:1295 (emphasis added).

The Supreme Court of Louisiana has carefully evaluated § 22:1295 and its underlying policies. In <u>Gray v. American National Property & Casualty Co</u>., the court explained that:

> Louisiana statutory law provides for UM coverage for the purpose of providing "full recovery for automobile accident victims who suffer damages caused by a tortfeasor who is not covered by adequate liability insurance." Flowing from this statutory protection principle are a number of well-established jurisprudential principles. For example, this court has long held that the existence and extent of UM coverage is determined not only by contractual provisions, but also by the applicable statute, currently La. Rev. Stat. 22:680.[1] Because of this fact, UM coverage will be read into any automobile liability policy "unless validly rejected."

---

[1] § 22:680 was subsequently recodified as § 22:1295, but the overall text was unaffected.

> This court has further held that the statutes providing for UM coverage in the absence of a valid rejection or selection of lower limits must be liberally construed, while the statutory exceptions to UM coverage must be strictly construed. Any exclusion from coverage must be clear and unmistakable. Thus, "the insurer bears the burden of proving any insured named in the policy rejected in writing the coverage equal to bodily injury coverage or selected lower limits."

977 So. 2d 839, 845 (La. 2008) (citations omitted). The court went on to list the six tasks needed to validly reject or reduce UM coverage: (1) the insured must initial the selection or rejection chosen to indicate that the decision was made by the insured; (2) if lower limits are selected, then the lower limits must be entered on the form to denote the exact limits; (3) the insured or the legal representative must sign the form evidencing the intent to waive UM coverage; (4) the insured or legal representative must include his or her printed name to identify the signature; (5) the insured must date the form to determine the effective date of the UM waiver; and (6) the form must include the policy number to demonstrate to which policy it refers. Id. at 846-47.

**1. Omission of the Policy Number Did Not Invalidate the UM Selection Form**

It is clear that the absence of a policy number on the UM selection form completed by the Villarrubias in October 2003 did not invalidate that form. In Duncan v. U.S.A.A. Insurance Co., a

12

UM form was invalidated because the policy number, which existed at the time, was omitted when the form was completed and signed. 950 So. 2d 544, 554 (La. 2006).  However, when the Villarrubias signed their UM form in October 2003, no policy had been issued yet, and no policy number had been assigned.  Moreover, the court in Gray noted that Insurance Commissioner Bulletin LIRC 98-03 provides that when a policy number is not available, then the space for a policy number may be left blank or a binder number can be inserted in its place.  Gray, 977 So. 2d at 847 n.2.  The validity of a UM waiver, rejection, or selection is determined by the law in effect at the time the waiver is executed, Richardson v. Lott, 928 So. 2d 567, 568 n.3 (La. App. 1 Cir. 2006), and LIRC 98-03 was in effect when Mr. Villarrubia purchased his insurance policy from Encompass.  Therefore, the omission of the policy number did not invalidate the UM selection form completed by Mr. Villarrubia in October 2003.

**2.   The Increased Umbrella Coverage Limit Did Not Create a New Policy and Did Not Require Completion of a New UM Form**

The Villarrubias admit completing a UM selection form on October 23, 2003, and that the lower UM limits they selected applied to the policy issued on November 18, 2003.  It is also undisputed that Mr. Villarrubia originally requested umbrella coverage in the amount of $1 million and that the umbrella

13

coverage amount of $500,000 stated in the November 2003 policy was done in error.  The December 2003 policy was issued to correct this error in umbrella coverage, and the interpretation of this policy under § 22:1295 is at issue in order to determine the appropriate UM coverage for Mrs. Villarrubia's February 2008 accident.  The question is whether a policy issued as a correction of a clerical error that affects limits of umbrella coverage results in the creation of a new policy, in which case a new UM selection form must be completed, or whether it is merely an amendment or correction of an existing policy, in which case a new UM selection form is not required.

According to § 22:1295(1)(a)(ii) above, "a new policy shall mean an original contract of insurance which an insured enters into *through the completion of an application on the form required by the insurer*."  § 22:1295(1)(a)(ii) (emphasis added).  There is no evidence that Encompass or the Aparicio Agency required a new application form in order to correct the Villarrubias' umbrella coverage from $500,000 to $1 million.

The Villarrubias rely on <u>Degruise v. Houma Courier Newspaper Corp.</u> where the court found that an increase in umbrella coverage from $5 million to $10 million created a "new policy, which required the execution of a new selection/rejection form."  657

So. 2d 580, 591 (La. App. 1 Cir. 1995). Like the plaintiffs in Degruise, the Villarrubias' change to their policy doubled the umbrella coverage amount. However, the instant facts are plainly distinguishable from those in Degruise, where the policy containing the $5 million umbrella limit "was renewed various times." Id. Mr. Villarrubia, on the other hand, never selected the $500,000 umbrella coverage he was originally issued by mistake, and within three weeks the policy was corrected to reflect Mr. Villarrubia's original request. Accordingly, the Court finds that the Villarrubias' December 2003 policy was not a new policy for purposes of § 22:1295.

The Court finds that the December 2003 insurance policy was issued merely to correct the clerical error in the November 2003 policy and was not intended to increase liability coverage beyond the limits previously selected by the Villarrubias. Mr. Villarrubia did not seek a new policy at that time, but merely asked for a clerical error to be corrected. Therefore, the Court finds that § 22:1295 did not require the completion of a new UM selection form.

**B. The Villarrubias' Allegations of Bad Faith**

Regarding the Villarrubias' allegations of bad faith, The Court finds that the Villarrubias have failed to show that no

genuine issue of material fact exists regarding Encompass' interpretation and handling of their insurance claim.  Thus, summary judgment on this issue is inappropriate.

Accordingly, **IT IS ORDERED** that Defendant's **Motion for Summary Judgment (Rec. Doc. 41)** is **GRANTED**, and Plaintiffs' **Partial Motions for Summary Judgment (Rec. Docs. 82 and 83)** are **DENIED**.

New Orleans, Louisiana, this 18th day of May, 2011.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE